[No. 1366.]

D. C. SIMPSON, APPELLANT, v. A. E. HARRIS, THE LANG-
LEY & MICHAELS COMPANY, A CORPORATION, AND
W. H. CHEDIC, INTERVENER, RESPONDENTS.

21   353
21   509
31*1009
34*  450

21   353
22   145
22   146

GIFT—EVIDENCE INSUFFICIENT TO ESTABLISH.—Defendant H. pur-
chased of the intervener his stock of goods, gave his note and a
chattel mortgage in part payment, and paid four thousand dollars, by
a check of plaintiff, his father-in-law. Subsequently plaintiff also
took a chattel mortgage on the stock, to secure payment of the four
thousand dollars, and it was filed for record before intervener's
mortgage. In plaintiff's action to foreclose his mortgage, the inter-
vener claimed that his delay in recording his mortgage was
occasioned by plaintiff' representations to him that he had advanced
the money to defendant H. as a gift, and the request of plaintiff to
intervener not to record his mortgage because it would injure de-
fendant H.'s credit, and the further representation of plaintiff that
the advancement was a family matter, and that defendant H. would
not have to re-pay it. Another witness testified that plaintiff told
him that he had advanced four thousand dollars for defendant H.,
and he would have time to work the debt out. On the other hand, it
was shown that at the time defendant H. took the check, he gave
plaintiff his note for four thousand dollars, and shortly afterwards he
had the stock insured, making the loss, if any, payable to plaintiff.

Vol. XXI—45

*Held,* that the evidence was insufficient to establish a gift of the four thousand dollars from plaintiff to defendant H.

STATUTE OF FRAUDS—PROMISE TO PAY DEBT OF ANOTHER—A promise by plaintiff to intervener to take up the debt due him from defendant, if intervener would not record his mortgage, was void under the statute of frauds, there being no evidence of the promise in writing, and it also appearing that the intervener did not, in consideration of the promise, release any of his security against defendant, but continued to press him for payment.

CHATTEL MORTGAGE—FAILURE TO RECORD—ACTUAL NOTICE.—Under Stat. of 1887, p. 66, providing that no chattel mortgage shall be valid, except as to the parties thereto, unless the mortgagee takes possession of the mortgaged property, or the mortgage be recorded, an unrecorded mortgage, where there is no delivery of the property, is void as to all creditors of the mortgagor, even though they have actual notice of the existence of such mortgage.

AGREEMENT TO EXECUTE MORTGAGE—EQUITABLE ESTOPPEL.—Plaintiff read the agreement between defendant and intervener for the sale of the property, and he drew his check for four thousand dollars, to be paid on the consummation of the agreement, which was that defendant was to deposit the four thousand dollars in bank as a guaranty of good faith, to be applied on the purchase price of the stock, on the completion of the inventory, and that defendant should give his notes, secured by a valid mortgage on the stock, for the remainder of the purchase price. *Held,* that plaintiff participated in the agreement to such an extent that he must have known that the mortgage to intervener was to be the prior lien on the stock, and that he was estopped from asserting his subsequent mortgage as a prior lien, though it was first recorded.

DELAY IN RECORDING—CREDITOR'S RIGHTS.—As plaintiff waited several months after the consummation of the agreement before he had his mortgage executed and recorded, and in the meantime others had given defendant credit for goods—a credit to which he was not entitled, and would not have obtained but for the negligence of plaintiff, which amounted to a violation of a legal duty—the mortgage of such creditors will be preferred to plaintiff's, though it was subsequently executed and recorded.

TRIAL OF EQUITY CASES—SUBMISSION OF SPECIAL ISSUES—EFFECT OF GENERAL VERDICT.—Only special issues should be submitted to a jury in an equity case and a general verdict alone in such a case is improper, but when a party to such an action makes no objection to a general verdict and does not ask the court to supply omitted findings, every material fact necessary to support it will be presumed to have been found in the general verdict.    (Concurring opinion of BIGELOW, J.)

APPEAL from the District Court of the State of Nevada, Ormsby county.

*Richard Rising,* District Judge.

The facts are stated in the opinion.

*Sardis Summerfield* and *W. E. F. Deal*, for Appellant.

I.   It was clearly error on the part of the court below to sub-ordinate the lien of appellant to that of the Langley & Michaels Company as to the property embraced in appellant's mortgage.

II.   Appellant's mortgage was not only recorded before inter-vener's, but appellant had taken possession of the mortgaged property and had brought action to foreclose his mortgage before intervener filed his mortgage for record.  Intervener's mortgage was void as to appellant until recorded, even though appellant had actual notice of it.  (Stat. of Nev. 1887, p. 66; *Gassner* v. *Patterson*, 23 Cal. 299; *Harms* v. *Silva*, 91 Cal. 636; *Chenyworth* v. *Daly*, 7 Ind. 284; *Lockwood* v. *Slevin*, 26 Ind. 124: *Kennedy* v. *Shaw*, 38 Ind. 474; *Ross* v. *Menefee*, 25 N. E. Rep. 545; *McDowell* v. *Stewart*, 83 Ill. 539; *Bevans* v. *Bolton*, 31 Mo. 437; *Travis* v. *Bishop*, 13 Met. 304; *Rich* v. *Roberts*, 48 Me. 550; *Milburn Manf. Co.* v. *Johnson*, 24 Pac. Rep. 17.)

III.   The court erred in admitting evidence tending to prove declarations of appellant to the effect that he would pay the debt owing from defendant Harris to intervener.  Such evi-dence was mere hearsay.  Its admission was in direct contra-vention of the statute of frauds.  (Gen. Stat. Sec. 2630.)  The testimony all shows that intervener did not rely on any promise of appellant to pay the debt of defendant Harris but that he continued to press Harris for payment of the debt.  In an action at law against appellant upon the promises testified to by intervener and his witnesses, intervener would have been non-suited, as he should have been in this case.  (*Mallory* v. *Gil-lette*, 21 N. Y. 412.)

*Robert M. Clarke*, for Intervener and Respondent.

I.   The mortgage from defendant Harris to intervener, as between them, vested the legal title to the property mortgaged in the intervener.  (3 Nev. 313; 14 Cal. 85; 35 Cal. 404; 63 Cal. 550.)

II.   As between intervenor and defendant Harris, it was not necessary to record the mortgage.  It was valid without record. This being true, it follows that recording the mortgage could have no other effect than imparting notice.  The language of the act concerning conveyances, " against any other person than the parties thereto," was intended to meet the decision of

*Clute* v. *Steele,* and to bring general creditors within the provisions of the statute.

III. Counsel for appellant mistake the issue. It is not concerning the validity of intervener's mortgage, but concerning the validity of appellant's mortgage. The jury said that appellant's mortgage was given and received to defraud intervener.

IV. The general principles laid down in the books with reference to fraud are inapplicable to this case, as are also decisions upon statutes relating to the conveyance of land. The chattel mortgage act alone must control this case. (Herman on Chattel Mortgages, 75; *Gassner* v. *Patterson,* 23 Cal. 299; Jones on Chattel Mortgages, Sec. 314.)

IV. The facts and circumstances in evidence establish a clear case of actual fraud "It is established with us, both in law and equity, that our recording acts only apply in favor of parties who have acted in good faith, and cannot be made the means of fraud and oppression. It is therefore held in this country in general, that a conveyance duly registered passes no title whatever when taken with a knowledge of the existence of a prior unregistered conveyance." (2 Lead. Cases in Eq. 183; 9 Johnson 163; 19 Wend. 339; 4 Mass. 637; 1 Brevard 331; 8 B. Monroe 442; 4 Me. 20; 4 Scammon 117; 15 Ill. 542; 1 Dev. Eq. 110; 28 Me. 255; 11 Forter 332; 25 Ala. 272; 2 Cal. 203; 2 Iowa 420; 16 Am. & Eng. Ency. 828, 829 and note 2; 7 Cal. 450; 21 Cal. 167; 22 Cal. 143, 200; 34 Cal. 563, 612; 36 Cal. 390; 49 Cal. 124; 63 Cal. 564; 91 Cal. 639, 640; 32 N. J. Eq. 652; 11 Nev. 431; 124 N. Y. 376; 126 N. Y. 187; 127 N. Y. 53; *Read* v. *Horner,* 51 N. W. Rep. 207.)

V. It is agreed in the contract of sale that intervener's demand for the balance of the purchase money should " be secured by a valid chattel mortgage upon the stock of goods and fixtures." Appellant had knowledge of this agreement, dictated its terms, advanced his money in pursuance of it and agreed that intervener should have the very security of which he now seeks to deprive him. Appellant having assented to the contract of sale is bound by it.

*J. D. Torreyson,* for Langley & Michaels Company, Respondent.

I. The court did not err in preferring the mortgage of Langley & Michaels Company to that of appellant notwithstanding

the pleadings. Had the court done otherwise the mortgage of Langley & Michaels Company would have been subordinated to that of intervener, which was never intended and which intervener does not claim. (*Sayre* v. *Howes*, 32 N. J. Eq. 659; *Clement* v. *Kaighn*, 2 McCart. 47; Jones on Chattel Mortgages, Sec. 318.)

By the Court, MURPHY, C. J.:

This is an action commenced by D. C. Simpson, in the district court of Ormsby county, to foreclose a chattel mortgage, made, executed and delivered to him by A. E. Harris. The Langley & Michaels Company was made a party defendant, it claiming an interest in the property as subsequent mortgagees to Simpson. Walter H. Chedic, by leave of the court first had, filed his complaint of intervention. A. E. Harris failing to answer, his default was duly entered. D. C. Simpson answered the complaint of intervention. We glean from the record the following facts:

On the 12th day of May, 1891, Walter H. Chedic was engaged in the drug business in Carson City, Nevada; on that day he entered into an agreement with A. E. Harris to sell the stock of goods at wholesale catalogue price, freight added, the actual cost of fixtures in the store occupied by him, and five hundred dollars to be paid for the good will of the business.

The goods were invoiced, and on the 4th day of June, 1891, the sale and delivery of the personal property were completed by delivering possession of the same to A. E. Harris; he paying therefor eight thousand three hundred and sixty-three dollars and fifty cents, of which sum Harris paid four thousand dollars in cash, and gave his note for the sum of four thousand three hundred and sixty three dollars and fifty cents, payable in installments of three hundred dollars each, with interest at the rate of ten per cent. per annum; the first payment to be made on the 4th of September, 1891, and each subsequent payment should become due at intervals of three months apart from the said 4th day of September; and, to secure the payment of this note, A. E. Harris made, executed and delivered to Walter H. Chedic a mortgage on the merchandise then in the store and store room. This mortgage was not recorded until the 3d day of February, 1892.

On the 12th day of May, 1891, D. C. Simpson drew his check

in favor of A. E. Harris for the sum of four thousand dollars, to make the first payment on the goods, when the invoice should be completed and the agreement closed, which said sum of money was paid to Chedic on the 4th day of June, when the property was placed in Harris' possession. At the time that Simpson drew his check, Harris made, executed and delivered to Simpson his promissory note for the sum of four thousand dollars, payable one day after date, with interest thereon at the rate of ten per cent. per annum. On the 14th day of November, 1891, Harris, not having paid the amount due Simpson, gave him a new note for the said sum of four thousand dollars, and to secure the payment thereof made, executed and delivered to Simpson a mortgage on all the goods and personal property in the store, which mortgage was recorded on the day of its execution.

On the 25th day of January, 1892, A. E. Harris, being indebted to the Langley & Michaels Company for goods, wares and merchandise sold and delivered to him after he had taken possession of the store, made, executed and delivered to said company his promissory note for the sum of seven hundred and ninety-one dollars and nineteen cents, and to secure the payment of the said note gave a mortgage on the stock of goods then in the store. This mortgage was filed for record on the date of its execution. On the 2d day of February, 1892, Harris not having paid the Simpson note, Simpson demanded of and received possession from A. E. Harris of all the personal property then in the store, and on the same day commenced this action to foreclose his mortgage.

The cause was tried by the court with a jury on the complaint of Simpson, who made the Langley & Michaels Company a party defendant, it claiming to have an interest in and claim upon the mortgaged property, subordinate and subsequent to the mortgage lien of plaintiff Simpson.

The Langley & Michaels Company answered this complaint, setting out its note and mortgage from Harris to it, and admitting that its mortgage lien, claim and interest was and is a junior lien and subordinate to the mortgage lien of plaintiff Simpson, upon the property described in Simpson's mortgage, but claimed that the mortgage lien of Chedic was and is subsequent and subordinate to the mortgage lien of plaintiff Simpson, and of the defendant the Langley & Michaels Company. Wal-

ter H. Chedic, by leave of the court first had and received, filed his complaint of intervention, claiming a prior lien on all the property as against Simpson, or the Langley & Michaels Company mortgage.

In the complaint of intervener, Chedic, he alleges, upon information and belief, that the note as set out in Simpson's complaint was not made until the 14th day of November, 1891. Chedic also alleges that after his mortgage was made, acknowledged, sworn to and delivered, and after the payment to him of the sum of four thousand dollars on account of the purchase of said personal property, and said Chedic well knowing that unless said chattel mortgage was recorded in the office of the recorder of the county where said personal property was situated, and in the county where said mortgageor resided, the same would be invalid as to all persons except the parties thereto intended, and was proceeding to have the same recorded; and the said D. C. Simpson requested and prevailed upon said Chedic not to record the same, and requested and induced the said Chedic to withhold the same from the record of said county, declaring, among other things, "that the purchase of said personal property and advancing and payment of the sum of four thousand dollars was a family matter, and that Harris would not be called upon or required to secure or pay the sum of four thousand dollars, or any part thereof, and that the whole of said property would be and remain the property of said Harris and security of said indebtedness of four thousand three hundred and sixty-three dollars and fifty cents, the balance of said purchase money." And said Chedic alleges that, relying upon the statements, declarations, promises and assurances of the said plaintiff Simpson, and at the instance and request of said Simpson, the said Chedic withheld said mortgage from record, and did not record the same until the 3d day of February, 1892. Simpson answered this complaint and denied every allegation thereof charging deceit, collusion or fraud on his part.

The jury returned a general verdict in favor of intervener Chedic, upon which the court rendered its findings as follows:
·  "*First:*   That the mortgage of Langley & Michaels Company was a valid lien upon the goods, drugs and personal property described therein, and as to all of said property was a prior and superior lien to the lien of intervener Chedic, and to all of

said property not described in the mortgage of D. C. Simpson, was prior and superior to the mortgage of the said Simpson.

*Second:* That the mortgage of W. H. Chedic was a good and valid mortgage as against A. E. Harris, from the date of its execution and delivery thereof, and as against all persons from the date of the record thereof, to-wit: the 3d day of February, 1892, and under and in conformity with the verdict of the jury in this action, was and is a valid and subsisting lien upon the goods, drugs and personal property described therein, as against the said D. C. Simpson, and as against said plaintiff D. C. Simpson is a prior and superior lien to the mortgage and lien of said D. C. Simpson, but is subordinate to the mortgage of said Langley & Michaels Company.

*Third:* That the mortgage of D. C. Simpson is a valid lien as against A. E. Harris upon the goods described therein, but upon the verdict of the jury is subordinate to the lien of the said intervener, W. H. Chedic, and to the mortgage lien of Langley & Michaels Company."

The court ordered the property to be sold by the sheriff, and the proceeds of such sale to be applied as follows: (1) Payment of all costs and expenses of the sale; (2) payment of the Langley & Michaels Company claim; (3) payment of the Walter H. Chedic demand; (4) payment of Simpson's claim.

The appeal is taken from the judgment and order of the court denying plaintiff Simpson's motion for a new trial, and the errors assigned are as follows: (1) That the evidence is insufficient to justify the verdict, judgment or decree; (2) said verdict, judgment and decree are against law; (3) errors of law occurring at the trial and excepted to by plaintiff Simpson.

In the complaint of intervener Chedic, it is alleged, and upon the trial it was sought to be established, that the four thousand dollars advanced by Simpson to A. E. Harris on the 12th day of May, 1891, was a matter of favor, or in other words, a gift, and not a loan.

In support of this position, Chedic testified that Harris was Simpson's son-in-law. In a conversation he had with Simpson, Simpson said : " Harris being a young man, it would impair his credit to have the mortgage recorded against him, and he (Simpson) said that I had the only mortgage against the store, and the money he had put up for Harris was a family matter, and that Harris would not have to pay him back, and

if he did pay him it was all right, and if he did not pay it was all right." Dr. Guion testified that he had a conversation with Simpson, in which Simpson said that he had put up or advanced the sum of four thousand dollars for Harris to purchase the business, and Harris would have time to work the debt out. Simpson in his answer denies that the money was a gift. In his testimony he denies that it was advanced as a matter of favor or a gift, but that it was a loan to Harris, and Harris was to repay the same. Harris testified that the money advanced by Simpson was a loan, and they both testified that the day that Simpson drew his check for the sum of four thousand dollars, Harris made, executed and delivered to Simpson his promissory note for the amount of money, payable one day after date; and that note was introduced in evidence without objection.

The circumstances surrounding this transaction do not indicate to our minds that the money advanced by Simpson was intended as a gift. Harris testifies that, after his first talk with Chedic in relation to purchasing the property, he went to Dayton to get the money from Mr. Gignoux. Gignoux informed him that he could not let him have the money for a month. Harris then saw Simpson about indorsing his note to Gignoux, offering to give Simpson a mortgage on the stock of goods to protect him against loss. Simpson refused, giving as his reason for such refusal that he would not indorse for any one, but told Harris to wait until he came to town and if he had the money in bank he would loan it to him. Harris also testified that it was the understanding between Simpson and himself on the 12th day of May, 1891, at the time of the drawing of the check and the giving of the note, that Simpson should have a mortgage on the stock of goods to secure the payment of the four thousand dollar note. On the 5th day of June, 1891, the property was insured for the sum of five thousand dollars against fire, loss, if any, payable to D. C. Simpson. In our opinion the testimony introduced on the part of the intervener is not sufficient in law or equity to establish a gift of money. Such evidence should be clear and unmistakable of the intent to give.

In *Ide* v. *Pierce*, 134 Mass. 264, the court said: "Future interests in money, if they can be established by oral testimony, must be established by clear and satisfactory testimony." Simpson's conduct and dealing with the subject-matter all go

irresistibly to show that he did not intend the advancement as a gift. A gift is the voluntary transfer of money or property by one to another, without any consideration or compensation therefor. To make a gift *inter vivos* valid, the transfer must be executed; for the reason that, there being no consideration therefor, it falls under the ban of the statute of frauds, and no action will lie to enforce it. To consummate a gift there must be such a delivery by the donor to the donee as places the property under the dominion and control of the donee, with the intent and purpose on the part of the donor to transfer the title absolutely, never reclaiming or expecting repayment of the thing transferred. Was there such a transfer of the money by Simpson to Harris, or what was equivalent thereto? We think not. If such was Simpson's intention, he would not have taken the note on the 12th day of May, 1891, when he drew his check in favor of Harris for the four thousand dollars, nor would he have required the policy of insurance to read, " Loss, if any, payable to D. C. Simpson;" and each of these transactions had taken place long before this litigation could have been thought of.

In the case of *Johnson* v. *Spies*, 5 Hun. 471, it is said. " A gift by words, without a delivery or something equivalent thereto will not suffice, according to the loosest statement of the rule of law upon this subject."

In *Zimmerman* v. *Steeper*, 75 Pa. St. 149, the judge said : " To determine the validity of a gift, its subject-matter must be considered. If capable of delivery, it must be actually or constructively delivered. If it be not, then it is still executory, and being without consideration, is bad either as a gift *inter vivos* or a *donatio causa mortis*. The gift of a bond, note or any other chattel, therefore, cannot be made by words *in futuro*, or by words in *præsenti*, unaccompanied by such delivery of possession as makes the disposal of the thing irrevocable." (*Morse* v. *Low*, 44 Vt. 564; *Williams* v. *Forbes*, 114 Ill. 167; 2 Kent Comm. 438; *Taylor* v. *Henry*, 48 Md. 557; *Northrop* v. *Hale*, 73 Me. 68; *Robinson* v. *Ring*, 72 Me. 144; *Taylor* v. *Fire Department*, 1 Edw. Ch. 296; *Rockwood* v. *Wiggin*, 16 Gray, · 402.) A transfer by gift contemplates a transfer of the entire ownership, both legal and equitable. Any reservation of a right of control or dominion will therefore defeat the operation of the intended gift. (*Young* v. *Young*, 80 N. Y. 430; *Curry* v. *Powers*,

70 N. Y. 214.) The intent to give is a necessary element of the transaction. Delivery without intent to vest the title in the donee could pass no title to him. (*Jackson* v. *Railway Co.*, 88 N. Y. 524; *Beaver* v. *Beaver*, 117 N. Y. 421; Id., 16 N. Y. Supp. 746; Bish. Cont. Sec. 434; 1 Pars. Cont. 234; *Ide* v. *Pierce*, 134 Mass. 260; *Nutt* v. *Morse*, 142 Mass. 3; *Hayden* v. *Hayden*, 142 Mass. 448; *Thompson* v. *Dorsey*, 4 Md. Ch. 149; *Brewer* v. *Harvy*, 72 N. C. 177; *Shoonmaker* v. *Plummer*, 29 N. E. Rep. 1114; *Justice* v. *Justice's* Ex'rs., 18 Atl. Rep. 674; *Seminary* v. *Robbins*, 27 N. E. Rep. 341.) A debt is not extinguished by a mere statement by the creditor that he does not intend to enforce it, or that he forgives it, or even by a receipt for the whole, when in fact a part only has been paid. (*Irwin* v. *Johnson*, 36 N. J. Eq. 348; *Snowden* v. *Reid*, 10 Atl. Rep. 175; *Flanders* v. *Blandy*, 12 N. E. Rep. 321.)

In the case at bar there is no evidence in the record which would warrant the jury in finding that the money advanced by Simpson to Harris was a gift. There is no evidence that Simpson ever told Harris, nor any one else, that the money was a gift, and so long as Simpson held Harris' note in his possession, it would negative the gift theory. The finding of the court in which it recites that there is due and owing from A. E. Harris to D. C. Simpson the sum of four thousand dollars, principal debt, and three hundred and sixty-six dollars and sixty-six cents interest, shows conclusively that the court did not adopt the verdict of the jury on the gift theory; for if the court had so found, it would have decreed that Harris was not indebted to Simpson in any sum of money whatever upon the note, on the ground that a gift is attended with delivery and possession, and takes effect immediately. It is then a gift executed and can not be retracted. Therefore, there being no delivery of the note to Harris, he could not in an action as between himself and Simpson claim the money advanced to be a gift under the facts of this case, and the contention of the intervener can not be maintained either at law or in equity. (*Daniel* v. *Smith*, 30 Pac. Rep. 575.)

It is alleged in the complaint of intervention that the Simpson note and mortgage were made, executed and delivered by Harris, and received by Simpson, to hinder, delay and defraud the creditors of A. E. Harris, and to hinder, delay and defraud the intervener Walter H. Chedic; and in support of this charge

Chedic testified as follows:　That Simpson participated in the making of the agreement with Harris and himself on the 12th day of May, 1891.　That on the 4th day of June, 1891, after Chedic had received Harris' note and mortgage, Harris went across the street to Rail's store, as he said he was going, and when I came out of the bank I met Harris, and he said to me: Before you record that mortgage, Mr. Simpson would like to see you.　The mortgage was in my hand at the time.　I was on my way to the recorder's office to have it recorded.　It was several days after I got the mortgage.　I don't know how many after. I waited and waited to see Simpson, and he finally met me; and he said he would rather I would not record that mortgage, because if I did it would handicap Mr. Harris in business, and if I did not record it he said he would take it up himself; and I said I would see about it.　I went and saw mother about it, and it was all right; and I went right back and met Mr. Simpson and told him that if he would take it up I wouldn't record it; and it went on in that way for some time.　Simpson said that Harris being a young man it would impair his credit to have the mortgage recorded against him, and he (Simpson) said that I had the only mortgage against the store, and the money he had put up for Harris was a family matter, and that Harris wouldn't have to pay him back, and if he did pay him it was all right, and if he didn't pay it was all right.　This is what influenced me not to put my mortgage on record.　In the month of October, 1891, I met Simpson coming up the street, and asked him if it was not about time for him to take up that mortgage, and he said: Yes, I will in a short time.　He said: Wait a short time, and I will take it up.　I told him I would record the mortgage if he didn't take it up soon.　I did not see Simpson again after October, until after this suit was commenced in February, 1892.

Tracey Chedic testified that he had overheard the conversation between his brother and Simpson in October, 1891, in which his brother asked Simpson about that money that was due.　Simpson said that it would be all right, he would pay it in a few days.　Brother said: If you don't pay in a few days I will put it on record.　And Simpson said: Don't put it on record, for the money will be paid in a few days.

Owen Jones testified that he overheard the conversation in October, 1891, in which Chedic asked Simpson if he was not

going to take up that mortgage; and Chedic said:   If you don't
I will place it on record.   And Simpson replied:   I will take it
up soon.

Simpson, by his testimony, denies that he ever asked or
requested Chedic not to record his mortgage.   He denies that
he ever promised Chedic to take up the Harris note and mort-
gage.   He admits that Chedic did at one time ask him to take
it up, but he inferred from Chedic's conversation that he wanted
to discount it to him.

Harris in his testimony denies that he ever requested Chedic
not to record his mortgage until Simpson saw him.

The evidence is very conflicting, and it is well settled that
the appellate court will not substitute its own judgment for
that of the jury as to a matter of fact dependent upon conflicting
evidence, unless where, upon the whole record, it should appear
that the jury acted so unreasonably in weighing the testimony
as to justify a strong presumption that their minds were swayed
by passion or prejudice, or that they were governed by some
motive, the inferences of which could not be drawn from the
testimony; and section 2641, Gen. Stat., provides that the ques-
tion of fraudulent intent, in all cases arising under the provi-
sions of this act, shall be deemed a question of fact and not of
law.   Therefore, under the above section, and the decided cases
by this court, if there is any testimony in the record which
tends to support the verdict of the jury, the same must be sus-
tained.

Is Simpson's alleged promise or agreement to take up the
note and mortgage given by Harris to intervener Chedic, as tes-
tified to by Chedic and the witnesses, within the statute of
frauds?   It is provided in section 2630, Gen. Stat., Nevada:
"In the following cases, every agreement shall be void, unless
such agreement, or some note or memorandum thereof, express-
ing the consideration, be in writing and subscribed by the par-
ties charged therewith.   *   *   *   *Second.*   Every special
promise to answer for the debt, default, or miscarriage of
another."

It is evident that the promise or agreement of Simpson, if he
ever made such, is within the letter of the statute; and the
authorities are uniform that the promise to pay the debt of
another cannot be enforced unless it be in writing, and when
so reduced to writing it becomes of itself a distinct contract

and must rest upon its own consideration. Courts have in the interest of equity and fair dealings so construed statutes similar to the above as to hold that many cases which were apparently within the letter of the law were in fact without the statute and not controlled by the requirements thereof, such as a promise to pay the debt of another is not within the statute if its consideration was the abandonment to the promisor of a security for the payment of the debt, consisting of a lien upon or interest in property to which the promisor then had a subordinate title or lien. (Throop, Verb. Arg. Sec. 592 *et seq.*; *Wills* v. *Brown*, 118 Mass. 138; *Spooner* v. *Dunn*, 7 Ind. 81; *Power* v. *Rankin*, 114 Ill. 54.) But the above rule cannot be invoked in Chedic's behalf, because, from his own testimony, he collected the September payment from Harris, and was urging him to make the December payment, and by so doing manifested a design not to rely upon Simpson's promise to pay the Harris note. Whether a promise comes within the statute does not depend so much upon the consideration of the promise, but upon the fact as to whether the original party remained liable. Therefore, if Simpson made the alleged promise, and Chedic wished to rely upon it, and did not seek to enforce his claim as against Harris, it would be regarded in law as an original promise and a distinct contract, and would be enforceable as against Simpson; but not having released Harris, nor surrendered his lien to Simpson, he cannot enforce the same as against Simpson.

Under our statute, is a mortgage of personal property, not recorded, valid as against creditors who had knowledge of the existence of the mortgage and the transactions that led up to the giving of the same ?

By the rule of the common law, on a transfer of goods or chattels, absolute or conditional as against third persons, there must be a delivery and a continued change of possession of the thing sold or assigned. By section 66 of an act of the legislature of 1861 (Stat. 1861, p. 20), it is declared that " no mortgage of personal property, hereafter made, shall be valid against any other person than the parties thereto, unless possession of the mortgaged property be delivered to and retained by the mortgagee." This act was amended by Stat. 1869, p. 55, also by Stat. 1885, p. 53, and again by Stat. 1887, p. 66; and it now reads: " No mortgage of personal property shall be valid for

any purpose against any other person than the parties thereto, unless possession of the mortgaged property be delivered to and retained by the mortgagee, or unless the mortgage shall be recorded in the office of the county recorder of the county where the property is situated." Independent of any statutory provision, and in compliance with the act of the legislature of 1861, a delivery of the mortgaged property to the mortgagee would be necessary to the validity of the instrument. But it seems to have been the intention of the legislature to enact a law to enable the owners of personal property to make a valid transfer by way of mortgage, as security, and yet permitting such mortgageor to retain possession and have the control and use of the goods or chattels until the conditions as set forth in the mortgage were broken, presuming that the recording of the mortgage would give equal or perhaps greater notoriety to the transaction than the bare possession of the mortgagee.

The language of the statute is plain and unambiguous, and the plain implication is that if possession is not taken, or the mortgage not recorded, it is absolutely void as against all persons except the parties thereto. With this construction, the statute is a protection against fraud, quite as effectual as that given by the common law or the act of 1861; but if we should hold that an unrecorded mortgage may be enforced as against a creditor who has acquired a lien upon the property by mortgage or otherwise, it seems to us that the door for fraud is left wide open.

The statute under consideration is unlike statutes in relation to the recording of deeds and mortgages of real estate, and chattel mortgages in other states, wherein it is enacted that unless recorded they are fraudulent and void as against any subsequent purchaser or mortgagee in good faith, and for a valuable consideration. The words, "good faith and valuable consideration," are omitted from our statute. In statutes where the words "good faith" are used, the courts have held that a purchaser or subsequent mortgagee, knowing of the existence of a mortgage on goods or chattels, was not a purchaser or mortgagee in good faith; therefore they acquired no title to nor lien upon the property. But in states having statutes similar to our own, the courts have universally held that a subsequent purchaser, mortgagee or creditor could acquire a title to, or lien upon, the property notwithstanding they knew of the outstand-

ing lien, if the same was not recorded in strict compliance with the statute.

The statute under consideration is similar to the Indiana statute, with the addition to the last named, requiring the mortgage to be recorded within ten days after the execution thereof. In the case of *Chenyworth* v. *Daily*, 7 Ind. 285, Davisson, J., speaking for the court, said : " This enactment is clear, direct and positive. It admits of but one construction. Between the parties to this suit, the mortgage under consideration, unless recorded within the time limited, had no validity. * * * As the case stands, the mortgage must be considered a nullity; and the claimant, having rested his title to the property upon that instrument, was not entitled to recover. It was not sufficient for him to prove merely that the mortgage was recorded; but, in addition, he was bound to show that, in accordance with the statute, such recording took place within ten days after its execution."

In *Lockwood* v. *Slevin*, 26 Ind. 125, it is said : " The language is so plain that no room is allowed for construction." * " The fact that the appellees had notice of the mortgage can make no difference as to the question of the validity thereof. By the plain provisions of the statute, such an unrecorded mortgage is only good as between the parties thereto." In the case of *Granger* v. *Adams*, 90 Ind. 88, the court held : " It is settled that a mortgage of goods, where possession is retained by the mortgageor, is not valid as against creditors unless executed and recorded in strict accordance with the statute. The common law did not recognize the validity of such instruments against creditors, and the cases are well agreed that one who asserts a right, under such an instrument paramount to the claims of creditors, must show that all has been done that the statute requires. At common law possession was essential to the validity of the mortgage, as against creditors of the mortgageor. Registration is made by law the substitute for possession, and in order that registration shall have this effect, it must be such as the statute prescribes." (*Scarry* v. *Bennett*, 28 N. E. Rep. 231.)

In construing the chattel mortgage act in California, from which we have reason to believe ours was copied, in the case of *Gassner* v. *Patterson*, 23 Cal. 299, the court said: " The evi-

---

* Dissenting opinion of Gregory, C. J., p. 132.

dence shows that Timson, before and after the time of his pur-
chase, had full knowledge of the mortgage.  *  *  *  These
provisions are plain, simple and most imperative in their terms.
The privilege of holding a lien upon certain kinds of personal
property in the possession of the mortgageor is accorded to the
mortgagee, in certain cases, upon the performance of certain
conditions.   These conditions are few, and easily performed,
and there need be no difficulty, with ordinary care, in fully com-
plying with them.   But they are made essential to the validity
of the mortgage.   The courts have no right, no power, to extend
the statute by construction so as to include property not men-
tioned in it, or to dispense with any of the conditions the legis-
lature has seen fit to impose.   If we should once begin and
attempt to relieve parties in cases of hardship, the law
would be in danger of being frittered away and its benefits
entirely lost to the community.   The present case is perhaps
one of hardship upon the plaintiff, but it is a consequence
of his own oversight and neglect.   But the respondent insists
that the defendant Timson is not a purchaser in good faith, and
therefore he can not hold the property free of the mortgage,
and refers to section 15 of the statute of frauds.   That section,
however, does not apply to this case, which is governed, as we
have shown, by section 17 of the statute of frauds, and the
chattel mortgage act, which make no exception of that kind.
They declare the mortgage void as against any other person
than the parties thereto."

In the case of *Travis* v. *Bishop,* 13 Metc. (Mass.) : 04, Shaw,
C. J., held " that when personal property is mortgaged, with-
out a delivery thereof to the mortgagee, and the mortgage is
not recorded, a party who buys the property of the mortgageor,
and takes possession of it, though he has knowledge of the
mortgage, will hold the property against the mortgagee."  And
in *Bingham* v. *Jordan,* 1 Allen, 373, Hoar, J., said:  "An
unrecorded mortgage of personal property, which is not
delivered to and retained by the mortgagee, is not valid against
the assignee in insolvency of the mortgageor."  In *Drew* v.
*Streeter,* 137 Mass. 460, the plaintiff claimed under a mortgage
executed on the 8th day of June, 1882, and recorded on the
9th day of June, 1882.   The defendant claimed under an attach-
ment made on the same day, but after in point of time the
giving of the mortgage.   The only question in the case was

which took priority. The public statutes of Massachusetts allowed fifteen days in which to file and record chattel mortgages. The plaintiff contended that, if recorded within the fifteen days, it would take effect from the date of its delivery, and would be entitled to priority over any intervening title or lien. In passing upon this question, Morton, C. J., said: "The general statutes provided that unless a mortgage is recorded it shall not be valid against any person other than the parties. By implication, when recorded, it was valid; but it was uniformly held under this and preceding similar statutes that the registration did not relate back to the date, and that the mortgage must yield to any intervening attachment or other liens."

In *Rich* v. *Roberts*, 48 Me. 551, the plaintiff offered to prove that the attaching creditor had notice of the existence of the chattel mortgage before the attachment was made. This testimony was objected to, and the objection sustained. In passing upon the objection, the court said: "The revised statutes touching the recording of deeds of real estate have changed the former law, so that actual notice of an unrecorded deed, to persons making claim to the estate subsequently to its delivery from the same source, alone will postpone the latter to the former. In the statutes requiring the record of mortgages of personal property in order to make them effectual, there is no such qualification; and it cannot be properly inferred that one was intended against the imperative language used." And in *Sheldon* v. *Connor*, Id. 585, it is said: "Statutes requiring a mortgage of personal property to be recorded, to render it valid, makes no exception; and one subsequently purchasing or attaching the property will not be affected by an unrecorded mortgage, notwithstanding he had actual notice of it." (See, also, *Selking* v. *Hebel*, 1 Mo. App. 340; *Bevans* v. *Bolton*, 31 Mo. 437; *Parroski* v. *Goldberg*, 50 N. W. Rep. 191.)

Without the citation of further authorities on this point, of which there are many, we shall hold that an unrecorded mortgage where the goods or chattels are not delivered to and possession retained by the mortgagee or the mortgage recorded in strict compliance with the statute, is absolutely void as to all creditors of the mortgageor, even though they have notice of the existence of the mortgage. To hold otherwise would be to place a construction upon the statute never intended by the

legislature, and would aid in the perpetration of, instead of preventing, frauds.

The question for us to determine is, was Simpson a party to this transaction; true it is that his name does not appear in the Chedic note or mortgage, and in that view of the case he is not a party thereto. The parties thereto are the mortgageor and mortgagee. But Simpson admits that he had knowledge of and read the agreement entered into between Chedic and Harris on the 12th day of May, 1891, and that he drew his check for the sum of four thousand dollars in favor of Harris, to be paid to Chedic on the consummation of that agreement. In substance that agreement was, that Harris was to deposit the sum of four thousand dollars in the bank of Wells, Fargo & Co., at Carson City, Nevada, as a guaranty of good faith, and that sum should be applied as a payment on the purchase of the property, on the completion of the inventory, and that Harris should give his notes of three hundred dollars each, secured by a valid mortgage upon the stock of goods and fixtures in the store, for the sum of four thousand dollars.

It must have been the intention and understanding of all the parties that the agreement and giving of the notes and mortgage to Chedic would be one and the same transaction—the making of the agreement, the initiatory step. the giving of the notes and mortgage on completion of the inventory, the consummation of the same. Simpson must have known and understood when he read that agreement that the mortgage to Chedic was to be the prior lien, as against the property, and if he required a mortgage to secure him in the payment of the money he advanced, such lien was to be subordinate to the Chedic mortgage; and although Simpson was not an actual party to the agreement, and in the sense in which that term is used, yet he participated and aided in the agreement and purchase to such an extent that it would be wrong to hold that he could acquire a subsequent mortgage which would or could constitute a prior lien to Chedic's. Such would be an act of fraud and injustice, and Simpson is bound by an equitable estoppel, for " he remained silent when he should have spoken," and we have a right to presume that he acquiesced in the agreement; and, without a doubt, the part he took in the making of the agreement formed a material inducement to Chedic in parting with his property and led him to be-

believe that Simpson was a party to the transaction, or if not such, any lien that Simpson might acquire on the property to secure the four thousand dollars then advanced by him would be subordinate to his own. Where two mortgages are executed by the same mortgageor, parol evidence is admissible to prove that they are so connected with each other that they may be regarded as one and the same transaction, and placed in such order of priority and succession as will carry out the intention, and secure the rights of the parties; and it is a question of fact, for the jury to determine, which is to have priority, by showing the acts and declarations of the parties had at the time of the giving of the mortgages or the entering into the compact that led up to the giving of the same. (*Walker* v. *Vaughn*, 33 Conn. 584; *Pomeroy* v. *Latting*, 15 Gray, 436; *Gilman* v. *Moody*, 43 N. H. 243; *Stafford* v. *Van Rensselaer*, 9 Cow. 317; Bigelow, Estop. p. 492 et seq.; Bigelow, Frauds, p. 31; Herm. Estop. Secs. 934, 935.) We must, then, conclude that Simpson's mortgage was taken with a full knowledge of all the attending circumstances. He participated and aided in the making of the agreement, and by its terms Chedic's mortgage was intended to be a prior lien to any acquired by Simpson for the money advanced on the 12th of May, 1891; and with such knowledge as he had of the transaction, on the ground of public policy, he cannot now be permitted to controvert the facts which that agreement must have suggested to his mind.

There was no contest in the lower court between D. C. Simpson, as plaintiff, and the Langley & Michaels Company for position. The priority of the Simpson mortgage lien was admitted by the answer of the company. There is no testimony in the record changing the position as made by the pleading. The verdict of the jury was in favor of intervener Chedic.

The court disregarded the verdict, in so far as it affected the Langley & Michaels Company's claim, and placed its lien prior in order of payment to the Chedic lien, which, under the pleadings of the company, the complaint of intervention, and the law and facts in the case, was the proper thing to do. But was the court authorized, on the issues raised by the complaint of Simpson and answer of the company, to disregard the pleadings and prayer in the answer, and place the Langley & Michaels Company's mortgage lien prior, in order of payment

thereof, to Simpson's? Such an issue has never been tried in the case. In its findings the court substitutes a new issue. The judgment and decree appear to be entirely independent of the allegations and admissions which constituted the basis upon which the complaint and answer were framed.

It is a rule in courts of equity as well as courts of law, that judgments and decrees should follow the pleadings and the evidence. But this rule is not universal. It is subject to modifications. Courts of equity will exercise their jurisdiction, and relieve a party from a mistake of law, when such mistake was induced by facts and circumstances giving rise to an independent equity on behalf of the party liable to be injured by the strict enforcement of what would appear to be the terms of the contract or agreement. When the conduct of the other parties is inequitable, courts of equity will interpose and rectify the wrong. Applying the above principle to this case, we find that, as between the Langley & Michaels Company and Chedic, Chedic has no standing in court whatever, neither legal nor equitable. His mortgage is an absolute nullity, as against that company's mortgage. But Simpson's mortgage is not void, but merely voidable as to the Langley & Michaels Company, by reason of his own laches in not insisting upon the execution and recording of his mortgage lien within a reasonable length of time after the agreement had been entered into between Harris and himself. Harris took possession of the store on the 4th day of June, 1891; he was permitted to deal with the property as the absolute owner thereof; there was nothing said or done to indicate to the outsiders that there were any liens against the property. Under these circumstances the Langley & Michaels Company furnished Harris with goods to run his business. The conduct of Simpson and Chedic gave to Harris a credit which he was not entitled to, and their negligence amounted to a violation of a legal duty, and they will not be permitted to take advantage of their own wrong. Under these circumstances no good could be accomplished by sending the case back and allowing the Langley & Michaels Company to amend its answer. Therefore the judgment will stand affirmed as to that company.

Numerous errors are assigned as to the admission and rejection of testimony, and giving and refusal of instructions as between Chedic and Simpson. While in some instances the rulings may not have been strictly accurate, but under the

issues of fraud raised by the pleadings large latitude of inquiry is permissible; and all the facts and circumstances tending to throw light upon the transaction, as between the parties implicated, may be given in evidence. But the admitting, giving, or refusal, in this case, could not have misled the jury; and as justice has manifestly been done, we do not feel disposed to disturb the verdict or judgment.

The judgment and order appealed from are affirmed.

BIGELOW, J., concurring:

I concur in the conclusion announced by Chief Justice Murphy, but upon grounds somewhat different from those stated by him. There can be no question that under our statute, where there is no change of possession of the property, a chattel mortgage which is not recorded until a second mortgage has been honestly and in good faith taken and recorded, must be postponed to the second mortgage, although the latter was taken with notice of the existence of the first. The statute itself is clear, and the numerous cases cited by appellant's counsel show that the question has been too often decided to be now open to further controversy. It is admitted by the pleadings that the intervener Chedic's mortgage was taken first, but not recorded until after the plaintiff Simpson's was made and placed on record. Simpson had notice of the first mortgage, but this alone is not sufficient to postpone his mortgage to the other. In my judgment, however, there are other grounds sufficient to support the decree. They are—*First,* that Simpson persuaded and induced Chedic not to record his mortgage, and afterwards took advantage of the fact that he had not done so, to get his own recorded first; *second,* that Simpson took his mortgage with intent to hinder, delay and defraud Chedic in the collection of his mortgage. Without recapitulating the allegations of the complaint of intervention, it is enough to say that the facts constituting these defenses are sufficiently set forth.

There can be no question that Chedic's mortgage, although not recorded, was good as between the parties. The fact that it was not recorded would only make it void as to others, who did not occupy the position of a party. It would be good as against Harris' heirs, legatees, donees or assignees, and, except as required to pay debts, good also against his executors and

administrators. (Jones, Chat. Mortg. Secs. 237, 238, 239; Herm. Chat. Mortg. Sec. 70; Waite, Fraud. Conv. Secs. 112-122.)

The only reason that can be urged why it is not good as against Simpson is that it was not recorded. But upon this point it is alleged that when Chedic was about to place it upon the records, he was requested and induced by Simpson not to do so. If so, Simpson is estopped from raising this objection. In Bigelow on Estoppel (page 507), speaking of a case which had been under discussion, it is said: " This, it may be proper to observe, is only an illustration of the familiar principle that if A induce B to omit taking certain steps, he cannot afterwards object that B did not take them." *Ashworth* v. *Brown*, 15 Phila. 207, is to the same effect. So, where one has requested or induced another to take certain steps, he cannot afterwards object that the other had no authority or right to take them, or that he should not have done so. (*Johnson* v. *Allen*, 62 Ind. 57; *Gebhardt* v. *Reeves*, 75 Ill, 301; *Burlington* v. *Gilbert*, 31 Iowa, 356; 2 Herm. Estop. Sec. 1221.)

Again, the intervener alleges that Simpson's mortgage was made and taken for the benefit of the mortgageor, Harris, and to hinder, delay and defraud Harris' creditors, and particularly to hinder, delay and defraud the said Chedic, by preventing him from recovering the amount due upon his mortgage. This, also, constitutes a full and complete defense to Simpson's mortgage, although the sum for which it was taken was actually and honestly due him from Harris. If his mortgage was taken, not to secure himself, but to protect Harris, and to prevent Harris' other creditors from obtaining their just demands, then it was void as against those creditors. (Herm. Chat. Mort. Secs. 151, 170; *Fuller* v. *Paige*, 26 Ill. 358; *Billings* v. *Russell*, 101 N. Y. 232; *Bradley* v. *Ragsdale*, 64 Ala. 559; *Boyd* v. *Turpin*, 94 N. C. 137; *Blennerhassett* v. *Sherman*, 105 U. S. 107; *Mechanics' Nat. Bank* v. *Burnet Manuf'g. Co.*, 33 N. J. Eq. 486.)

So here we find at least two defenses set up in the intervener's complaint, either of which, if true, is sufficient to postpone it to Chedic's mortgage, even though it was made for an honest debt and was recorded before Chedic's was. There may be others, but these are sufficient for the purposes of this decision.

The next point that naturally arises is, were either of these defenses established ? The manner in which this case was tried is not to be commended. A jury was called, but no special

issues were submitted to them, and they only found a general verdict in favor of the intervener. Where a jury is called in an equity case, only special issues should be submitted to them, and when found, their verdict is only advisory of the court. (*Duffy* v. *Moran*, 12 Nev. 94, 97; Haynes, New Trials & App. Sec. 234.)

A general verdict in such a case is improper and should be disregarded. (*Wingate* v. *Ferris*, 50 Cal. 105; *Brandt* v. *Wheaton*, 52 Cal. 434; *Warring* v. *Freear*, 64 Cal. 54; *Learned* v. *Castle*, 67 Cal. 41.) If it could possibly have any weight with the court in deciding the case, it would only be where it was submitted to them under instructions clearly defining the questions upon which they were to pass, so that it might be known what had been determined by them and what had not. Even this was not done here, so far as can be judged from the instructions as presented in the transcript. The result is that the verdict is valuless, but as the plaintiff made no objection to the course taken, he can not now take advantage of the error. As the verdict in an equity case has no value until adopted and sanctioned by the court, and then only as a part of the findings, a motion for new trial should be made upon the findings and not upon the verdict. (*Duffy* v. *Moran*, 12 Nev. 94; *Stockman* v. *Irrigation Co.*, 64 Cal. 57; *Bates* v. *Gage*, 49 Cal. 126.) The same as in any other case, if the findings do not cover the issues made by the pleadings, every material fact not found must be presumed in favor of the judgment. (*Jones* v. *Adams*, 19 Nev. 78, 80, 82; *More* v. *Lott*, 13 Nev. 381.) This principle applies here.

The findings do not cover the real issues in the case. They are only upon matters concerning which there was no controversy, such as the making of the mortgages, the order in which they were made and recorded, etc We are forced, then, under the doctrine of implied findings, to adopt the presumption that all the issues in the case necessary to support the judgment were found in favor of the intervener. The case is not so presented to us that we are called upon or permitted to review the evidence to determine whether it supports these implied findings. No request was made to the court to supply the omitted findings, nor is it assigned as error that the implied findings are contrary to the evidence. The proper practice, where a party wishes such questions reviewed in the appllate court, was

pointed out in *Welland* v. *Williams*, 21 Nev. 230.   We have seen that the intervener's complaint stated some good defenses.   Had the plaintiff asked for findings upon these issues, and the court refused them, it would have been error; had it found them in favor of the plaintiff, it would have left the decree without support; had it found them against him, he could have assigned as error that the findings were against the evidence, and perhaps he could have done this upon the implied findings.   (*More* v. *Lott*, 13 Nev. 381.)

I have looked into the assignments of error.   The most of them are, under this view, directed to immaterial matters, or are otherwise insufficient to raise any question.   (Haynes, New Trials & App. Sec. 150.)

The plaintiff's answer to the complaint of intervention alleges that the intervener is not the owner of the mortgage claimed by him.   No finding was made upon the point, so we must presume that it was found that he was the owner, as otherwise the judgment would not perhaps have gone in his favor.   Possibly the tenth assignment of the insufficiency of the evidence, raises the point that the evidence does not support such a finding. But in my judgment the evidence is sufficient.   It shows that although the intervener had assigned the mortgage, it was only done by way of security and had been reassigned to him before he intervened in the action.   The evidence also supports the implied finding attacked in the fourteenth assignment.   No error was committed in the admission of testimony.   One of the issues being fraud, all of the surrounding circumstances, including the conversation of the parties concerning the matter. were properly admitted as reflecting upon the question.   Conceding that in a case tried as this was, a party is entitled to ask instructions to the jury, no error was committed in refusing the two instructions asked by the plaintiff nor in modifying the others.

It remains to consider the order in which the decree directs the mortgages to be paid.   Subsequent to the making and recording of the plaintiff's mortgage, but before the intervener's was recorded, a mortgage was made and recorded to the Langley & Michaels Company, a corporation.   In their answer the company concede that the plaintiff's mortgage is entitled to payment before theirs, but as their mortgage was taken in good faith, and recorded before the intervener's, they are undoubtedly entitled to payment before the intervener.   Upon this state

of facts the Langley & Michaels mortgage should be paid before Chedic's, Chedic's before Simpson's, and Simpson's before Langley & Michael's. This presents what may be properly called a mathematical impossibility. The decree directs that Langley & Michaels shall be paid first, Chedic second, and Simpson third, As the nearest approach to justice possible under the circumstances, this was, in my judgment, correct, and is supported by the only precedents found upon the question. In *Sayre* v. *Hughes*, 32 N. J. Eq. 652, 659, it is said: "Where a third incumbrancer acquires a right of priority as against the first, but the act or omission from which such right flows does not change his relative position towards the second, yet, as it is impossible to put him in advance of the first without also advancing him over the second, his lien must of necessity be advanced to the first position, as against both the first and second incumbrances."

For these reasons I concur in affirming the judgment and order appealed from.