## STOCKGROWERS AND RANCHERS BANK OF RENO *v.* MILISICH ET UX.

No. 2767

January 16, 1930.                    283 P. 913.

*Cooke & Stoddard,* for Appellant:

*Green & Lunsford,* for Respondents:

## OPINION

By the Court, DUCKER, C. J.:

Being unable to concur in the tentative opinion drafted by the member of the court to whom this case was originally assigned, the writer is confronted with

the necessity of writing his views. This is a suit in equity to subject to the payment of a judgment obtained against Steve B. Milisich two certain notes held by Thora J. Milisich, his wife. From a judgment in favor of the defendants, and an order denying a motion for a new trial, the plaintiff has appealed.

The respondents were intermarried in 1907. From the time of their intermarriage until December, 1918, Steve B. Milisich was engaged in conducting a saloon in Reno, Nevada, during which time, according to his testimony, his profits were about $80,000. From December, 1918, to July, 1919, he conducted a soft drink business, and from the last-named date to June, 1920, he was out of business entirely. Both of the respondents testified that not long after their marriage Steve would turn over to Thora money for the household expenses during the current month, with the understanding that any excess over and above such expenses should become her separate property; that pursuant to such understanding she deposited such savings in savings bank and open accounts over a period of years, purchasing from time to time bonds, and making other investments. Steve testified that on occasions he deposited money to Thora's account, and that such deposits were intended as gifts from him. On May 10, 1918, the respondents loaned to Dennis O'Sullivan and wife $14,000, which indebtedness was evidenced by a note which was secured by a mortgage. On February 18, 1919, the respondents loaned the O'Sullivans $5,000, evidenced by a note and secured by a second mortgage.

Late in 1919 Steve began to figure on going into business again and interested Frank J. Byington. Together they incorporated the Nevada Confectionery Company, and in the latter part of June, 1920, the company began business. Prior to incorporation, Steve and Byington obligated themselves in a large sum for fixtures, equipment, etc., for the business. Among their obligations were notes aggregating $7,800, payable to the plaintiff. While so indebted, and on July 13,

1920, Steve by an instrument in writing sold, transferred, and assigned to the respondent Thora Milisich, his wife, all of his right and title in the two O'Sullivan notes and the mortgages securing the same. Thereafter Steve assumed this entire obligation and Byington was released. The respondent testified that the consideration for such assignment was moneys advanced by Thora out of her separate property aforementioned.

This action is to set aside such conveyance by Steve and to subject the O'Sullivan indebtedness to the payment of the obligation originally due it from Steve and Byington, and which Steve assumed. The jury impaneled at the request of respondents answered a number of special interrogations all favorably to them, and these answers were adopted by the court and incorporated in its findings.

The main contentions of the appellant are that the O'Sullivan notes and mortgages are the community property of the respondents; that the assignment was made without adequate consideration and with intent to defraud appellant. A question largely determinative of the case is whether the evidence is sufficient to establish that the moneys claimed by respondents to have been paid by Thora to Steve as a consideration for the assignment of the O'Sullivan notes and mortgages was her separate property.

Admittedly all of the money made by Steve in his saloon and soft drink business during the period mentioned was originally community property. The jury and the court found that between the date of the marriage of respondents, on October 19, 1907, and the month of July, 1919, Milisich gave to his wife various sums of money, aggregating in amount between $35,000 and $40,000, with the intention and understanding of the husband and the wife that the sums were gifts, and should be and become the separate property and funds of the wife, and that the same did thereby become the separate property of the wife. It was out of these moneys, or investments made therefrom, or both, that the respondents claim the

consideration for the assignment was made. It is unquestionably the law that a husband may make the wife a gift of community funds which will thereby become her separate property. As stated in Bailey v. Littell, 24 Nev. 304, 53 P. 308, 310: "There is nothing in our statutes prohibiting the husband from giving to his wife any property he may have, or in which he may have an interest, when such property is not subject to the claims of his creditors."

■ We have carefully considered all of the evidence, and are of opinion that it is sufficient to support the foregoing finding. The testimony of the husband and wife as to the various transactions claimed as gifts during the years Steve was engaged in the saloon business is positive and undisputed. He was solvent all the time and was making money. As previously stated, he testified that his profits amounted to $80,000. He owed no debts, and did not become indebted until after he engaged in business with Byington in 1920. So a motive to place his property beyond the reach of existing creditors cannot be charged against the bona fides of the gift transactions. Moreover, there is no evidence tending to show that creditors could be reasonably apprehended. A plausible reason for giving the money to his wife is assigned, namely, the desire to make further provision for his wife and two daughters above what Steve was able, on account of his business, to provide in life insurance. He testified: "The best I could get was $5,000 on account of being in the liquor business."

It is true we have repeatedly held that the evidence necessary to show a transmutation of community property into separate property must be of a clear and convincing character, but the evidence of the respondents in this case appears to us to be of that force. There is nothing in our law, nor can any sound reason be assigned, why the testimony of a husband and wife may not have that probative effect. While it must be conceded that such testimony is of a character easily to be fabricated, yet in the absence of something

tangible to impute to it suspicion, it cannot be deemed unreliable on the former account alone. The facility with which fraud may be consummated under pretense of gifts between husband and wife is merely to be kept in mind in weighing the evidence bearing on such an issue.

■ But it is not entirely accurate to say that the testimony of respondents stands alone in support of the gift transactions. That is true as to the intent to give. However, their testimony is corroborated by the several savings bank accounts introduced in evidence, in showing such delivery as placed the moneys under her exclusive dominion and control, an essential element of a gift inter vivos. 28 C. J. p. 630 et seq.; Simpson v. Harris, 21 Nev. 353, 31 P. 1009.

There is nothing in the cases of Laws v. Ross, 44 Nev. 405, 194 P. 465; Barrett v. Franke, 46 Nev. 170, 208 P. 435, or Milisich v. Hillhouse, 48 Nev. 166, 228 P. 307, opposed to the views we have expressed. In the latter case we stated that the plaintiff could not overthrow the presumption that the car in question was community property by the mere naked statement that the car was a gift; nor that the money and the car, which were given as consideration for the car in question, were gifts, but it was necessary to present facts from which the conclusion could be reached that they were not community property. In this case there is something more than a bare statement of such a conclusion. The manner of making the various gifts, the time in a general way, as well as the reason for making them, were detailed in the testimony of the respondents, which testimony was supplemented by the several savings bank accounts.

In Laws v. Ross it was pointed out by the court that the evidence fell far short of that required by the rule to show an intention to transmute community into separate property. In Barrett v. Franke we said that the opinion of either spouse as to whether property is separate or community is of no weight in determining its character in these respects. This is true; but in this

case the conclusion as to the separate character of the moneys mentioned does not rest on the opinions of the respondents, but on the facts which we believe were of sufficient weight to justify the judgment of the court.

The Washington case, Jones v. Duke, 151 Wash. 108, 275 P. 72, as well as the case cited therein, Abbott v. Wetherby, 6 Wash. 507, 33 P. 1070, 36 Am. St. Rep. 176, are easily to be distinguished on the facts from the case at bar. In both of these Washington cases the wives saved money out of the money given to them for household expenses, and the property in question was purchased with funds thus saved; but in neither of the cases was there any testimony, as there is in the instant case, that such surplus was given to the wife. In the case of Abbott v. Wetherby, the only testimony on the point was given by the wife. When asked how she obtained the money which she claimed to have paid for the land, she replied: "I obtained it this way: He would give me money for the house, and whatever was over was mine. He gave me money to purchase things. I used to spend part of what he gave me, and then the rest of it was mine; and, doing that, I very soon accumulated money." The simple fact in that case is that the wife, because she had saved the money given her by her husband to run the house, regarded her savings as separate property.

■ In the case before us, as previously pointed out, both respondents testified that it was the understanding that the excess of money, over what was turned over to the wife for household expenses during the current month, should become her separate property. Gifts from husband to wife may be made in this way. Kelley v. Kelley (Sup.), 164 N. Y. S. 172.

The contention that the assignment of the O'Sullivan notes and mortgages against appellant is void, because made with intent to defraud, was also resolved against appellant by the finding of the court. The court found that the answers of the jury that Thora paid Steve a valuable consideration of $8,000 or more for the assignment, and that the same was not made for the purpose

of defrauding appellant, or any other of Steve's creditors, were supported by the evidence.

Appellant contends that, under all the circumstances bearing upon the assignment, the burden of proof was on the respondents to show that it was an honest transaction and for a valuable consideration. Be that as it may, we are of the opinion that the evidence was sufficient to justify the court in finding as it did on these questions.

We have examined the other contentions made by appellant, and find them untenable. The judgment should be affirmed.

It is so ordered.

COLEMAN, J. (concurring):

I concur in the affirmance of the judgment and order appealed from, but with great reluctance. As an individual I believe the judgment is wrong, so far as the weight of the evidence is concerned, but as an official I cannot justify that view, the jury and trial court having passed upon its sufficiency.

Steve Milisich testified that during the time he was running the "Buffet" he cleared about $80,000, of which he gave his wife between $35,000 and $40,000, yet within a few months after he quit that business his wife was paying the household expenses and advancing money to him. In this situation the natural question is: Did he clear $80,000, as claimed, and, if not, what was the real motive in placing a large portion of his property in his wife's name?

SANDERS, J. (dissenting):

My earnest study of this voluminous record, devoted largely to a transcription of the testimony of defendants and respondents, and my "tentative" drafts of several "preliminary" opinions for approval by the judges in conference, is labor lost.

The case was before us at an earlier stage upon appeal from a decree *granting* plaintiff the relief prayed. S. & R. Bank v. Milisich, 48 Nev. 373, 233 P. 41. It

is now before us upon appeal from a decree *denying* plaintiff the relief prayed. The reversed position of the parties, upon this appeal, may be accounted for by the fact that the judge, who presided upon the former trial, without the assistance of a jury, was influenced to recede from his former decision by the findings of a jury, impaneled in this case as advisory to the court, all in favor of the defendants.

The case for clearness may be divided into two parts. Part 1 concerns the dealings between the spouses with respect to their common property, when the husband was engaged in a mercantile business under the trade-name "Grand Buffet," from the time of their marriage, in 1907, up to July, 1919, during which time the wife attended to the duties of the home and had no opportunity for obtaining money, except from her husband. Part 2 concerns the dealings between the spouses with respect to their common property, when the husband was engaged in a mercantile business under the trade-name "Silver Pheasant," or corporate name "Nevada Confectionery Company," from January 1, 1920, up to May 15, 1921, when and on which date the company was placed in the hands of a receiver upon the complaint or petition of its general creditors. Part 1 contains the story of the acquisition of the securities in controversy; part 2 the story of their assignment, made the subject of this suit.

The indebtedness of the defendant husband to the plaintiff bank, and for which indebtedness plaintiff recovered judgment against the husband for $7,300, accrued while he was engaged in said confectionery business. While so indebted to plaintiff and others in an amount of about $25,000, Steve Milisich, the husband, on, to wit, July 13, 1920, assigned and transferred to his wife, Thora Milisich, all his right, title, and interest in the O'Sullivan notes and mortgages, the only property in controversy, for the stated consideration of $10, "love and affection."

Upon the trial the plaintiff contended, and now insists, that the O'Sullivan notes and mortgages are community

property; that their assignment from the husband to the wife was entirely voluntary, and made for the purpose of hindering, delaying, and defrauding the creditors of the husband, including the plaintiff. On the other hand, the husband and wife contended, and now insist, that the assignment of said securities was made in good faith and for the valuable consideration of approximately $10,000 of the wife's moneys — her separate property—acquired by her through a system or plan adopted by the husband while conducting the "Grand Buffet," whereby he, from the time of their marriage, in 1907, and up to November, 1918, gave his wife out of the profits of the business as they accrued sundry and divers sums of money as her separate property, aggregating between $35,000 and $40,000.

Whether the moneys thus set apart to the wife by the husband from the profits of his community business as they accrued were gifts, intended as gifts, and understood to be gifts, and, in contemplation of law, her separate estate, is not a material question. We are called upon to deal with the question of whether as against the claims of existing creditors of the husband, the assignment of the O'Sullivan notes and mortgages, the only property in controversy, was fraudulent.

The testimony of the husband and wife, when studied in the light of the circumstances, fails to establish, with that convincing force the law requires, to transmute community property into separate property. According to her own testimony, the wife took from her savings accounts, which constituted all of her gift moneys, and gave sundry and divers sums therefrom to her husband while he was engaged in the confectionery business. Her counsel insist that the record shows that, prior and subsequent to the date of the assignment, the husband received from his wife as much as $9,789, which moneys were used by the husband in his confectionery business. There is nothing in the record to show that the wife, in her dealings with her husband while engaged in the confectionery business, dealt with

him at arm's length or as a creditor. The confectionery business was as much a community business as the husband's prior so-called liquor business.

The proof shows that at the time of the assignment, aside from his interest in the O'Sullivan notes and mortgages, the husband had no property, other than his "stock" interest in the Nevada Confectionery Company, which had no market value. While engaged in the confectionery business, the wife gave her husband, from her savings account, prior and subsequent to the assignment of the O'Sullivan notes and mortgages, approximately $9,789 in sundry and divers amounts, when required by him in his business and to meet his individual obligations. From the time the husband went out of business in July, 1919, the wife supported the family from her savings, and the husband contributed nothing to their support. The wife was in no sense a business woman. She was at all times under the influence of her husband. The proof shows that, when the husband was engaged in the confectionery business, the frequency with which he called upon her for money for his business and individual needs brought from her a protest that he would take from her all the money she had saved. Where property, which has been given by the husband, originally belonged to the community—as is the case here—a later donation by the wife to the husband restores it to that status. Cousin v. St. Tammany Bank, 146 La. 393, 83 So. 685.

The court below did not find that the relationship of debtor and creditor existed between the spouses when the husband was engaged in the confectionery business, but did find that the moneys paid for the purchase of the husband's interest in the securities were gift moneys —the wife's separate property. What was his interest? In two of its findings of fact the court found that $7,000 of the $14,000 note was money advanced by the wife from her savings, and that $7,000 was community funds; that $1,000 of the $5,000 note was advanced from the wife's savings, and the balance of $4,000 was a gift from

the husband to the wife; and that the note for $5,000 was inadvertently made payable to the husband and wife. In a subsequent finding of fact it was found, in short, that the wife paid $8,000, or more, as consideration for the assignment to her of the securities. If this be so, the wife is placed in the questionable position of having paid for the assignment as much as $9,789 for her husband's equity in one-half of the $14,000 note. This is significant.

I am satisfied, as the trial court upon the former hearing of the case was convinced, that the assignment of the O'Sullivan notes and mortgages, under the circumstances, was made to make themselves safe, and to prevent the securities from being taken from them for the husband's present and future indebtedness, incurred by the Nevada Confectionery Company, which became insolvent within a year after the "Silver Pheasant" was open for business in June, 1920.

I shall not debate with my associates the question of whether the testimony of the defendants established the fact of gifts by the husband to the wife of community funds while he was engaged in the liquor business, but in this connection I may say that, as I view their testimony, the setting apart by the husband to the wife of a portion of the profits of his community business, as they from time to time accrued, was just as consistent with the theory that they were placed in the wife's hands for safe-keeping, or for their joint benefit, or for the benefit of the wife and children, in case they survived the donor, as with the theory that they were gifts. It is well settled that the intention of the donor to make a gift inter vivos must not only be clear and unmistakable, but the intention must be inconsistent with any other theory. 28 C. J. 627.

I am clearly of the opinion that the court erred in dismissing the action against the defendant husband. The testimony of the defendants, when studied in the light of the circumstances disclosed by this record, convinces me that the fraud in the assignment from

the husband to the wife of the securities in controversy is so palpable and plain that to uphold the judgment would be against law and justice. Entertaining these views, I dissent from the opinion of the majority, with the hope that it will strengthen, rather than weaken, as an authority, the question decided.